**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ILLINOIS UNION INSURANCE COMPANY,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICALS INDUSTRIES LTD.,** | : | **No. 13-3869** |
| **Defendants.** | : | |

# M E M O R A N D U M

PRATTER, J.                                                     OCTOBER 11, 2013

The issue in this case is whether an excess insurance contract ("the Excess Policy")

between Plaintiff Illinois Union Insurance Company ("Illinois Union") and Defendants Teva

Pharmaceuticals USA, Inc. ("Teva USA"), and Teva Pharmaceutical Industries Ltd. ("Teva

Israel") binds the parties to arbitrate their dispute.[1] After Illinois Union sued in diversity in this

Court, Teva USA moved to compel arbitration and for attorneys' fees and costs (Docket No. 6).

Teva USA argues that the Excess Policy follows form to its underlying primary layer agreement

with another insurer ("SRI Policies II and III" or "the SRI Policies") and therefore that the

Excess Policy incorporates the SRI Policies' arbitration clause, Condition *o*. Illinois Union

opposed the Motion to Compel Arbitration on the grounds that Condition *o* is not in fact

incorporated into the Excess Policy and therefore that Illinois Union never agreed to arbitrate

---

[1] The arbitrability issue has been briefed and argued by Illinois Union and Teva USA. This opinion often refers to Teva USA and Teva Israel collectively as "Teva" because Teva Israel has indicated, through Teva USA's counsel at oral argument, that Teva Israel will comply with this Court's ruling after proper service of process upon it. An affidavit by an Eastern District of Pennsylvania's docket clerk and a return receipt for international mail indicate that service of process was effectuated (Docket No. 30).

with Teva. Illinois Union also contends that this Court should allow the English Commercial

Court, in which Illinois Union brought proceedings after Teva filed its Motion to Compel, to

decide the arbitrability question.

For the reasons discussed below, the Court holds that the language of the Excess Policy

incorporated Condition *o* of the underlying insurance agreement and therefore bound Illinois

Union to arbitrate with Teva. The Court will therefore grant Teva's Motion to Compel

Arbitration and for Attorneys' Fees and Costs (Docket No. 6) in part, to compel arbitration, but

deny it in part, as to Teva's request for attorneys' fees and costs.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an insurance dispute between Illinois Union and Teva Israel, an

Israel corporation, and its American subsidiary, Teva USA, a Delaware corporation with its

headquarters and primary place of business in Pennsylvania (collectively, "Teva").

In 2002, Teva Israel contracted with SR International Business Insurance Co. Ltd.

("SRI") for primary insurance against certain patent infringement claims. Pursuant to Generic

Products Patent Infringement Liability Insurance Policy No. 27372.1.1 ("SRI Policy I"), SRI

provided insurance from June 1, 2002, to June 1, 2003, for up to a total limit of $100 million,

with coverage restricted to liability "pursuant to the laws of the United States and Canada for

patent infringement occurring within the respective territories of the United States or Canada."

Policy No. 27372.1.1, Declarations, Condition *a* (Compl. Ex. B.); *see* Compl. ¶ 7. Among other

conditions, SRI Policy I contained Condition *o*, an arbitration clause providing, in full:

> Any controversy arising out of or relating to this Policy or its breach shall be
> settled by final and binding arbitration, from which there shall be no appeal, in
> accordance with the following. Unless otherwise agreed, the United Kingdom
> Arbitration Act 1996, as amended, shall apply and the arbitration shall be held in

London, England unless otherwise agreed to by the parties. Three arbitrators shall comprise the arbitration panel. The majority of the three arbitrators shall issue a written award resolving the controversy before them within thirty (30) days after the time both parties are required to submit their case and related documentation, unless such time is extended by the consent of the parties. The panel shall make an award of compensatory monetary damages but not of punitive or exemplary or enhanced damages. Said award shall be final and binding upon both parties in a court of competent jurisdiction. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the chairperson/umpire. The remaining costs of arbitration proceedings shall be allocated by the panel.

Policy No. 27372.1.1, Condition *o*. SRI Policy I contained no choice of law provision.

Teva USA then turned to Illinois Union for excess insurance up to a total limit of $5 million (above the $100 million primary layer in SRI Policy I). This Excess Policy identified SRI Policy I as the "Followed Policy," Excess Policy, Item 3 (Compl. Ex. A), and provided, in its "Insuring Clause," that

subject to all terms, definitions, conditions, exclusions and limitations of this policy, the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy [i.e., SRI Policy I], except as otherwise provided herein.

*Id.* § I. The Excess Policy further provided, in its "Underlying Insurance" provisions, that

[t]his policy is subject to . . . the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the policy period and except as otherwise provided herein) as are contained in or as may be added to the Followed Policy and, to the extent coverage is further limited or restricted thereby, to any other Underlying Policies. In no event shall this policy grant broader coverage than would be provided by any of the Underlying Policies.

*Id.* § IV(A). No other provision of the Excess Policy addressed arbitration or choice of law.[2] In a "Service of Suit Endorsement" that soon followed, Illinois Union amended the Excess Policy to provide for service of process on an agent in Philadelphia, Pennsylvania, and stated, "If you

---

[2] The parties also agreed at oral argument that no other provision addressed arbitration or choice of law.

request, we will submit to the jurisdiction of any court of competent jurisdiction." Serv. Suit Endorsement, Endorsement No. 2 (Compl. Ex. A).

Through yearly endorsements, Illinois Union and Teva USA continued to amend and extend the policy period through June 1, 2011. *See* Compl. ¶¶ 8-9. And in an endorsement effective June 1, 2003, the parties added Teva USA to the Excess Policy. Policy Am. Endorsement No. 4 (Compl. Ex. A). In 2006, Teva and SRI replaced SRI Policy I with Generic Products Patent Infringement Excess Casualty Insurance Binder, Policy No. 25631.3.14 ("SRI Policy II"). SRI Policy II contained substantially the same terms as SRI Policy I, as well as the same arbitration provision, verbatim and again as Condition *o*, as SRI Policy I. *Compare* Policy No. 27372.1.1 (SRI Policy I), Condition *o* (Compl. Ex. B), *with* Policy No. 25631.3.14 (SRI Policy II), Condition *o* (Compl. Ex. D). Like SRI Policy I, SRI Policy II contained no choice of law provision. Teva and Illinois then updated the Excess Policy to follow SRI Policy II. *See* Amendatory Endorsement No. 8, Item 3 (Compl. Ex. A).

On May 23, 2007, Teva and SRI amended their agreement once more ("SRI Policy III"). *See* Generic Products Patent Infringement Excess Casualty Insurance Binder, Policy No. 25631.3.18 (Compl. Ex. C). SRI Policy III incorporates SRI Policy II:

> It is further understood and agreed that the wording of this Policy shall be as per the expiring Policy No. MH25631.3.14 [SRI Policy II] (with the Policy period wording extended for one (1) year so as to confirm with the below Policy period) . . . .

*Id.* at 2. In turn, on June 1, 2007, Teva and Illinois Union amended the Excess Policy to apply in excess of SRI Policy III; the Excess Policy's Followed Policy remained SRI Policy II. *See* Amend Policy Period Endorsement, Endorsement No. 10 (Compl. Ex. A).[3] Subsequent

---

[3] The language of Endorsement No. 10 does not replace SRI Policy II with SRI Policy III as the "Followed Policy," but any change would not make a difference given that SRI Policy III incorporates SRI Policy II. *See also* Compl. ¶ 10.

endorsements continued the Excess Policy through June 1, 2011. *See* Endorsement Nos. 11-14 (Compl. Ex. A).

The instant case arose on July 2, 2013, when Illinois Union sued Teva USA and Teva Israel and invoked the Court's diversity jurisdiction. *See* Compl. ¶ 5. Teva had sought coverage under the Excess Policy for patent infringement lawsuits it litigated and ultimately settled. *See* Compl. ¶¶ 19-28; Teva Mem. at 5 (Docket No. 6). By initiating this lawsuit, Illinois Union hopes to obtain a declaratory judgment that Teva's claims are precluded based on a variety of grounds, including untimely notice, estoppel, and waiver. *See* Compl.; Illinois Union Resp. at 4 (Docket No. 17).

Teva moved next, on or around July 5, 2013, by initiating arbitration in London and seeking a declaration that, among other things, Illinois Union violated the Excess Policy by both failing to pay Teva's claims as well as filing the instant suit and thereby failing to arbitrate pursuant to the SRI Policies' Condition *o*. *See* Teva Mem. at 5-6; Illinois Union Resp. at 4. On July 12, 2013, Illinois Union's counsel sent Teva's counsel a letter claiming that the Excess Policy contains no arbitration clause and warning Teva that if it did not withdraw its notice of arbitration, Illinois Union would seek relief in the English Commercial Court. Teva instead filed the instant Motion to Compel Arbitration and for Fees and Costs, along with a supporting memorandum, on July 16, 2013 (Docket No. 6). Illinois Union responded six days later by initiating proceedings before the Commercial Court under the United Kingdom Arbitration Act 1996. Illinois Union Resp. at 5. On August 2, 2013, Illinois Union replied (Docket No. 17), followed again by Teva on August 9, 2013 (Docket No. 19), before Illinois Union returned fire once more on August 15, 2013 (Docket No. 23). The Court held oral argument on October 1,

2013, and the parties submitted their final supplemental briefs on October 8, 2013 (Docket Nos. 31 & 32).

## II. DISCUSSION

The Federal Arbitration Act ("FAA"), part of which implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("CREFAA"), provides the governing framework for determining whether Illinois Union and Teva have agreed to arbitrate the claims raised in Illinois Union's Complaint. The two determinative questions under the FAA and CREFAA are (1) whether Illinois Union and Teva agreed to arbitrate and (2) if so, whether the claims in Illinois Union's Complaint fall within the scope of that agreement. For the reasons detailed below, and based on the Complaint and its exhibits, the Court holds that as a matter of law Sections I and IV(A) of the Excess Policy incorporated the SRI Policies' arbitration clause, Condition *o*, and, therefore, that the parties agreed to arbitrate. The Court further holds that Condition *o*'s broad language encompasses the claims Illinois Union raises in its Complaint. Finally, the Court declines to postpone this ruling to allow the English Commercial Court to reach the arbitrability issue first, and also declines to award attorneys' fees or costs.

### A. The Controlling Framework: The Federal Arbitration Act and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards

The Federal Arbitration Act, 9 U.S.C. §§ 1–307, "provide[s] a framework for the development of a body of uniform federal law governing contracts within its scope." *Medtronic AVE, Inc. v. Advanced Cardio. Sys., Inc.*, 247 F.3d 44, 54 (3d Cir. 2001). Where the FAA covers the transaction in question, "federal law applies in questions regarding the construction and enforcement of an arbitration clause, even in those cases in which the district court's jurisdiction is based on diversity of citizenship." *Id.* (citing cases).

The FAA contains three chapters. Chapter 2, 9 U.S.C. §§ 201–208, implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *adopted* June 10, 1958, *acceded to by the United States*, Sept. 30, 1970, 21 U.S.T. 2517, 330 U.N.T.S. 3. *See* 9 U.S.C. § 201 ("The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter."); *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 84 (3d Cir. 2010); *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 288 (3d Cir. 2010). CREFAA governs arbitration provisions in international commercial agreements, *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 448-49 (3d Cir. 2003), as provided by § 202:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202. The Third Circuit Court of Appeals has distilled § 202's language to explain that "arbitration agreements fall within [CREFAA] if they arise from commercial, legal relationships, such as commercial contracts, except when those relationships are entirely between United States citizens and otherwise are domestic in nature." *Century Indemnity Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009) (citing 9 U.S.C. § 202); *accord Invista*, 625 F.3d at 84.

Further, the "domestic" FAA—i.e., Chapter 1—"applies to actions brought under [CREFAA] to the extent that the two are not in conflict." *Century Indemnity*, 584 F.3d at 523 (citing 9 U.S.C. § 208; *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334

F.3d 274, 280 (3d Cir. 2003)). Thus, although the Supreme Court's case law has often

"addressed only the domestic FAA, the principles undergirding those decisions apply to the

Convention's implementing legislation. . . . It is federal law that allows the parties to make and

enforce agreements that fall under the FAA or the Convention." *Ario*, 618 F.3d at 289.

The first question a court must ask to determine whether CREFAA and the FAA apply is

(1) "whether there is an agreement in writing to arbitrate the subject of the dispute." *Standard*

*Bent Glass Corp.*, 333 F.3d at 449 (internal quotation marks omitted). In addition to requiring

such an agreement, CREFAA also instructs the court to ask:

> (2) Does the agreement provide for arbitration in the territory of a signatory of the
> Convention?; (3) Does the agreement arise out of a legal relationship, whether
> contractual or not, which is considered as commercial?; (4) Is a party to the
> agreement not an American citizen, or does the commercial relationship have
> some reasonable relation with one or more foreign states.

*Id.* at 449 & n.13 (quoting *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186-87 (1st Cir. 1982)).

CREFAA, and by incorporating it, Chapter 2 of the FAA, stand for the proposition that

"signatory nations have effectively declared a joint policy that presumes the enforceability of

agreements to arbitrate." *Rhone Mediterranee Compagnia Francese di Assicurazioni e*

*Riassicurazoni v. Lauro*, 712 F.2d 50, 54 (3d Cir. 1983). Thus, where a court finds that

CREFAA's four requirements are met, "the court *must* order arbitration unless it determines the

agreement is null and void." *Standard Bent Glass Corp.*, 333 F.3d at 449 (emphasis added).[4]

The parties do not dispute that if this Court is to decide the arbitrability of Illinois Union

and Teva's dispute, CREFAA and the FAA must govern its decision. Nor do they dispute that of

CREFAA's four requirements (as applied through 9 U.S.C. § 202), three are satisfied—

---

[4] "[A]n agreement to arbitrate is 'null and void' only (1) when it is subject to an
internationally recognized defense such as duress, mistake, fraud, or waiver or (2) when it
contravenes fundamental policies of the forum state." *Rhone Mediterranee*, 712 F.2d at 53
(citations omitted).

contingent, that is, upon (1) whether they actually agreed to arbitrate as provided in Condition *o*, the SRI Policies' arbitration provision. Indeed, this Court finds that (2) Condition *o* provides for arbitration in London, i.e., within a territory of a Convention signatory, *see Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 154 (3d Cir. 2001); (3) the arbitration agreement arises out of a commercial legal relationship—an insurance agreement—between Teva and Illinois Union; and (4) Teva Israel is not an American citizen. So the determinative issue here—and the only disputed one—is (1) whether Illinois Union agreed with Teva to arbitrate this dispute. In particular, the parties dispute whether, as a legal matter of contract construction, the language of the Excess Policy incorporates Condition *o*, the SRI Policies' arbitration clause.

### 1.      Standard of Review

Before applying FAA and CREFAA principles and case law to any parties' dealings, a court reviewing a motion to compel arbitration must determine which standard of review to apply. The Third Circuit Court of Appeals has often explained that the Rule 56 summary judgment standard applies when there is a disputed issue of fact, such as whether the parties intended to contract at all, *see Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 53-55 & n.9 (3d Cir. 1980), or whether their contractual "agreements were forged, the signatory lacked authority to bind [the party resisting arbitration], or the actual words of the contracts are ambiguous," *Century Indemnity*, 584 F.3d at 530.

Recently, however, the Court of Appeals has made clear that where the parties do not dispute that a contract has been formed, but rather quarrel over "the legal effect of the uncontested contractual language"—i.e., whether their contract's language binds them to arbitrate—the "case involves contract construction and therefore requires a legal determination." *Century Indemnity*, 584 F.3d at 530. Instead of applying the Rule 56 standard, the court should proceed under Rule 12(b)(6) if it can conclude, "based on the face of a complaint, and documents

relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (citations and internal quotation marks omitted); *see Century Indemnity*, 584 F.3d at 530-31. "Inasmuch as [a] case involves contract construction, i.e., determining the legal effect of the . . . agreements' incorporation-by-reference language," the summary judgment standard "is inapposite . . . to the extent [it] requires that there not be a genuine issue of material fact as to an arbitration agreement's existence before a district court may determine whether the agreement exists as a matter of law and then, if it does, to compel arbitration based on the agreement." *Century Indemnity*, 584 F.3d at 530; *cf.* 9 U.S.C. § 4 ("The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . .").

At oral argument and in its subsequent supplemental brief, Illinois Union argued that *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, established a rule that an agreement to arbitrate must be "express" and "unequivocal." *See* Illinois Union Supp. Br. at 4 (Docket No. 31). That is not so. As discussed above, the "express, unequivocal" standard belongs to the summary judgment stage and to the issue of disputed *facts*, not the motion to dismiss stage and the resolution of the legal effect of contractual language. The Third Circuit Court of Appeals addressed the applicability of the purported "'express' and 'unequivocal'" standard at length in *Century Indemnity Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d at 527-32, in which it explained that that standard applied when a "genuine issue of fact as to the parties' intent prevent[s] the court from finding, as a matter of law, that the parties . . . formed an agreement to arbitrate," *id.* at 528 (citing *Par-Knit Mills*, 636 F.2d at 53-55). Nor does

the "express" and "unequivocal" language from *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,
Ltd.*, 636 F.2d 51, state "a *substantive* standard required of arbitration agreements to be
enforceable, seemingly without regard to the procedural posture of the case" and "regardless of
whether there is a disputed issue of fact as to the agreement's existence." *Id.* at 529 (emphasis
added). That argument—reminiscent of the one advanced by Illinois Union here—was expressly
rejected:

> [T]he Supreme Court, far from adopting the substantive requirement that
> arbitration provisions must be "express" and "unequivocal" to be valid, in fact
> rejected it. . . . Even if the Supreme Court in *First Options* [*of Chicago, Inc. v.
> Kaplan*, 514 U.S. 938 (1995)] did not reject the "express" and "unequivocal"
> standard outright to the extent that it is substantive—i.e., the burden of persuasion
> applied to whether arbitration agreements exist generally, rather than the
> summary judgment standard applied in the arbitration context—the applicable
> statutory language and other Supreme Court precedent preclude us from requiring
> arbitration agreements to be "express" and "unequivocal" in order to be enforced.
> Section 2 of the FAA declares that written arbitration agreements "shall be valid,
> irrevocable, and enforceable, save upon such grounds as exist at law or in equity
> for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). It is therefore
> not surprising that the Supreme Court has explained that threshold limitations
> placed specifically and solely on arbitration provisions are antithetical to the goals
> and policies of the FAA. It thus follows that requiring arbitration clauses to meet
> more exacting standards than those imposed by the applicable state-law principles
> on contracts generally would offend Congress's purpose in enacting the FAA: to
> put arbitration provisions "upon the same footing as other contracts."

*Id.* at 531-32 (citations omitted). Emphasizing that the FAA, by its very language, requires
arbitration agreements to be set "on an equal footing with other contracts when determining
whether the parties have agreed to arbitrate," the *Century Indemnity* Court instructed that "we
cannot subject a purported arbitration agreement otherwise within the scope of the FAA and
satisfying its requirements to a standard more demanding than that which we would apply to
other agreements under the applicable state law." *Id.* at 532. The *Century Indemnity* Court went
so far as to declare, "It is not too much to state that enforcement of a substantive requirement that

an agreement to provide for arbitration must be 'express' and 'unequivocal' would be a partial reincarnation of the courts' pre-FAA hostility to arbitration." *Id.* at 532 n.16.

After dismissing the "express" and "unequivocal" language as a substantive standard, the *Century Indemnity* Court clarified that "to determine whether the parties agreed to submit any disputes to arbitration, we apply ordinary state-law principles that govern the formation of contracts." *Id.* at 533 (citation and internal quotation marks omitted). Thus, any state contract law principles purporting to establish a higher standard for arbitration clauses than for other contract provisions are preempted. *See id.* at 524; *id.* at 532 (citation to and parenthetical regarding *Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993)). For these reasons, "Pennsylvania law," which applied in *Century Indemnity*—as well as here, for the reasons the Court discusses below—"does not require *and under the FAA could not require* an 'express' and 'unequivocal' statement specifically referring to the arbitration clause itself to incorporate that clause in another agreement." *Id.* at 555 (emphasis added); *accord GGIS Ins. Servs., Inc. v. Lincoln Gen. Ins. Co.*, 773 F. Supp. 2d 490, 503 (M.D. Pa. 2011) ("Neither *Century* nor other pertinent case law requires explicit reference to an arbitration clause in order for language of incorporation to incorporate an arbitration provision. To the contrary, since arbitration agreements are subject to the same standard of review as any other contract, no 'express' or 'unequivocal' reference to an arbitration clause is required.").

The Third Circuit Court of Appeals' decision in *Guidotti* nearly four years after *Century Indemnity* did not and could not purport to revive the substantive "express" and "unequivocal standard" or apply any such requirement to the Rule 12(b)(6) motion to dismiss stage. True, the *Guidotti* Court stated that "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be

deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Guidotti*, 716 F.3d at 773 (alteration in original) (quoting *Par-Knit Mills,* 636 F.2d at 54). But Illinois Union's argument takes this statement out of context. Consistent with *Century Indemnity*, and as explicated in detail above, the *Guidotti* Court instructed that whether there is an "express, unequivocal agreement" is the proper question *upon a motion for summary judgment under Rule 56*—viz., when there is a question as to whether there was ever a meeting of the minds, or whether the contract was never valid in the first place. *Id.* at 775.[5]

Here, the exhibits attached to the Complaint include the Excess Policy, which governs the relationship between Illinois Union and Teva, as well as the underlying SRI Policies. *See* Compl., Exs. A–D. Indeed, the parties agreed at oral argument that the Rule 12(b)(6) standard applies (but ostensibly not on what that standard actually is) and that the SRI Policies contain Condition *o*, the arbitration agreement in question. Rather than raising any issue of disputed fact, the parties dispute the legal effect of the language in the Excess Policy and the SRI Policies— namely, whether Sections I and IV(A) of the Excess Policy incorporate Condition *o*, the arbitration provision in the SRI Policies, such that Illinois Union and Teva, too, are bound to arbitrate.

In *Guidotti*, the eponymous class representative plaintiff asserted that she had not been given the agreement containing the arbitration provision, and was thus unaware of the arbitration provision, until three weeks after she had submitted to a debt settlement negotiation plan. *Guidotti*, 716 F.3d at 777. Thus, her contention was wholly unlike Illinois Union's here: while Illinois Union's argument concerns the construction of the Excess Policy's incorporation clauses,

---

[5] *Century Indemnity* settled this issue, and *Guidotti* is, as explained, not to the contrary. In fact, the *Guidotti* Court did not cite to *Century Indemnity* at all, let alone purport to overrule it. But even the *Guidotti* Court had done so, *Century Indemnity* would control. *See United States v. Joseph*, — F.3d —, —, No. 12-3808, 2013 WL 5273120 (3d Cir. Sept. 19, 2013) ("Because these cases were decided earlier, the rule derived from them is controlling.").

Ms. Guidotti contended that "because she did not see [the arbitration provisions] at the time she agreed to the [debt settlement negotiation] contract . . . there was no meeting of the minds on the agreement to arbitrate." *Id.* The absence of a meeting of the minds was not a matter of contract construction. To the contrary, the Court of Appeals found that Ms. Guidotti had come "forth with enough evidence in response to the . . . arbitration motion to trigger . . . the [Rule 56] summary judgment standard" for determining whether she had ever received the arbitration agreement in question. *Id.* at 779.

Beyond the procedural status differences, there are no such allegations or evidence here, and the Court "assum[es] that the sophisticated parties to the [Excess Policy Agreement] chose their language, particularly that of the incorporating provisions, carefully." *Century Indemnity*, 584 F.3d at 551. Because the question is one of the legal effect of contract construction— namely, whether Condition *o* is incorporated into the Excess Policy—the Court will determine the arbitrability question on the Complaint and attached exhibits now before the Court.

### 2. Whether the Parties Agreed to Arbitrate

Because "arbitration is a matter of contract, and no arbitration may be compelled in the absence of an agreement to arbitrate," the first step a court must take under either the domestic FAA or CREFAA is to decide "whether an agreement to arbitrate exists." *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107-08 (3d Cir. 2000). This initial inquiry actually comprises two questions, as outlined by the FAA case law: "a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Century Indemnity*, 584 F.3d at 523; *accord Standard Bent Glass Corp.*, 333 F.3d at 448-49 (holding that the first question that courts ask under CREFAA is "whether there is 'an agreement in writing to arbitrate the subject of the dispute'" (quoting CREFAA art. II, § 2; 9 U.S.C. §§ 201-208)). Both CREFAA and the FAA specify that this agreement must be "in writing," a term that

encompasses "an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.'" *Standard Bent Glass Corp.*, 584 F.3d at 450 (quoting CREFAA, art. II, § 2); *see* 9 U.S.C. § 2. Further, this "agreement in writing" term, like the FAA, allows for incorporation of an arbitration clause by reference. *See Standard Bent Glass Corp.*, 584 F.3d at 450 ("Though the arbitration clause may not have been included in that exchange, it was incorporated by reference in the letters. This is all CREFAA requires."); *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (Alito, J.) ("There are five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel.").

Under Chapter 2's incorporation of CREFAA into the FAA, "federal rather than state law governs international arbitration agreements." *Gen. Elec. Co.*, 270 F.3d at 154; *see Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519-20 (1974) ("[T]he agreement of the parties in this case to arbitrate any dispute arising out of their international commercial transaction is to be respected and enforced by the federal courts in accord with the explicit provisions of the Arbitration Act."). Similarly, even where foreign law or state law may apply to "the resolution of . . . the merits of the underlying controversy[,] . . . questions of interpretation and construction of such arbitration agreements are similarly to be determined by reference to federal law." *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. 1978). In turn, that federal law makes the parties' *choice of law* an issue because a court must not "force unwilling parties to arbitrate a matter they reasonably would have thought a judge . . . would decide." *Gen. Elec. Co.*, 270 F.3d at 154-55 (quoting *First Options*, 514 U.S. at 945 (alteration in original)); *accord Century Indemnity*, 584 F.3d at 533 ("The question whether the parties agreed to arbitrate certain disputes raises a choice-of-law issue."). In either the domestic or international setting a court will

therefore "respect the choice of law that parties agree upon to resolve their private disputes." *Gen. Elec. Co.*, 270 F.3d at 155; *see also Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted." (citation omitted)); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 628, 637 n.19 (1985) (explaining that "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute . . . by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act" (citation and internal quotation marks omitted), and upholding compulsion of arbitration under the FAA and Convention where contract had a choice of law clause identifying Swiss law as applicable). This federal command to apply the parties' choice of law is consistent with the FAA's background principle that "a court should apply ordinary state law principles governing contract formation." *Gen. Elec. Co.*, 270 F.3d at 155; *accord Century Indemnity*, 584 F.3d at 533.

### a. Choice of Law Governing the Excess Policy

Determining whether the Excess Policy incorporates Condition *o* requires a choice of law analysis that neither party appears keen on undertaking. Prior to oral argument, Teva argued that "[u]nder any applicable law, Illinois Union's Complaint admits that the [Excess] Policy incorporated the terms and conditions of the followed SRI Policy," Teva Mem. at 11 n.6, and stated that "this Court need not engage in a choice-of-law analysis to decide what law governs the incorporation of the arbitration provision," Teva Mem. at 3. For its part, Illinois Union took "no position on what substantive law governs the terms and conditions of the Policy or the

followed Policy other than the arbitration provision and fully reserves its rights on that point," while it nonetheless argued that "[b]oth parties agree that the law governing formation of a contract to arbitrate is determined by different factors than the law governing the terms and conditions of the policy." Illinois Union Resp. at 1 n.1. At oral argument, however, the parties conceded that if this Court decides the matter (as opposed to an English court), *Century Indemnity*, 584 F.3d 513, and along with it, Pennsylvania law, should govern, but they dispute whether it allows incorporation of Condition *o* into the Excess Policy. *See* Illinois Union Resp. at 13-16.

Despite this stipulation, neither party wants this Court to *hold* that Pennsylvania law applies, because they dispute the effect of such an outcome on future arbitration and/or litigation. For instance, Teva further contends that "[w]ith respect to choice of law, Illinois Union confuses the question of *enforceability* of the arbitration provision and the question of *incorporation* of the arbitration provision into the Policy." Teva Rep. at 8 n.9. Teva states merely that it "does not agree [with Illinois Union] that English law is the only law relevant to this question," *id.* at 3 n.2, but it likewise "does not concede that Pennsylvania law applies to the Policy," *id.* at 7 n.8.[6]

---

[6] As Illinois Union clarified at oral argument, it does not suggest that English law ought to apply to *this* Court's determination of the arbitrability question; rather, it contends that English law would apply in the English Commercial Court if *that* Court were to decide this arbitrability dispute and, because that tribunal should be the one to decide the dispute, English law ultimately should apply. *See* Illinois Union Resp. at 6-13. The Court addresses this contention in more depth below.

While Illinois Union states that Teva has "admit[ted] that English law applies to the arbitration clause," *id.* at 1 & n.13, it certainly is not clear whether Illinois Union is attempting to refer to the choice of law to govern the Excess Policy, the procedural rules to be followed in London, the enforceability of any arbitral award, or something else entirely. The parties remained equivocal regarding these issues at oral argument, but regardless of their resolution, these are distinct questions, as the Third Circuit Court of Appeals has made clear in another case:

> There has been much discussion by the parties concerning the applicability of
> German law or Pennsylvania law in the resolution of this dispute. It may well be

Notwithstanding the parties' willingness to bypass the matter, the Court cannot wholly ignore the question of which law applies to the construction of the Excess Policy. Because "arbitration is a matter of contract" that commits courts to "rigorously enforce arbitration agreements according to their terms," *Am. Exp. Co. v. It. Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (internal quotation marks and citation omitted), disputed incorporation issues require courts to determine the law under which to construe contracts in order to effectuate the contracting parties' intent, *see Century Indemnity*, 584 F.3d at 533. Thus, though the parties may hope that their persistent evasive maneuvering here regarding which law applies to the Excess Policy will give them breathing room later, the Court is required to engage the issue head on.

Because this case arises in diversity, *see* Compl. ¶ 5, the Court must "apply the forum's, namely Pennsylvania's choice of law rules in resolving the parties' dispute over which law applie[s] to the policy." *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999) (citing *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir. 1988) ("It is well established that a district court in a diversity action will apply the choice of law rules of the forum state in determining which state's law will be applied to the substantive issues before it.")). Of course, choice of law inquiries are multifaceted and complex, at least under Pennsylvania law, and especially so where, as here, the agreement contains no express choice of law provision.

Given this complexity, along with the parties' failure to brief or press the issue, the Court need not determine precisely which state's law applies because it finds, as explained below, that

> that the question of which law is to be applied will have to be answered in deciding the merits of the underlying controversy. However the case before us presents only the issue of the Arbitrability of that controversy.

*Becker Autoradio*, 585 F.2d at 43. Thus, for the reasons discussed in this subsection, the Court declines to read Teva's briefs as conceding that English law is the parties' choice of law for the construction of the Excess Policy or its incorporating language.

the outcome is the same—that is, Condition *o* is incorporated—whether the Excess Policy is governed by Pennsylvania, New York, or Illinois law (and there is no basis for using the law of any other state or country for construing the Excess Policy). For their part, as confirmed at oral argument, the parties seem to accept the applicability of *Century Indemnity*, and thus implicitly suggest that Pennsylvania law might govern the construction of the Excess Policy. But even from a distance it is clear that the law of one of these three states must control the construction of the contract: Teva USA's principal place of business and corporate headquarters are both in Pennsylvania, *see* Excess Policy, Item 1 (Compl. Ex. A); Compl. ¶ 2; notice of claims is to be made to an address in New York, Excess Policy, Item 7; Illinois Union appointed an agent for service of process in Pennsylvania, Policy Am. Endorsement No. 2 (Compl. Ex. A); Illinois Union is an Illinois corporation with its principal place of business in Illinois, Compl. ¶ 1; and Illinois Union chose to initiate its suit here in Pennsylvania. These observations leave little room for concluding that the law of any state other than these three applies.[7] The question therefore becomes what the outcome would be, and whether it would be any different, under each of these states' laws.

### b. Condition *o* Is Incorporated into the Excess Policy Under Pennsylvania, New York, or Illinois Law

Incorporation by reference is not problematic under CREFAA or the FAA and is enough to satisfy the requirement of an agreement in writing. *See Standard Bent Glass Corp.*, 333 F.3d at 450 ("Though the arbitration clause may not have been included in that exchange, it was incorporated by reference in the letters. This is all CREFAA requires. CREFAA reinforces a strong federal policy in favor of arbitration over litigation. . . . Given this strong policy, the

---

[7] Further, while Teva Israel is an Israel corporation with its principal place of business in Israel, *see* Compl. ¶ 4, Teva USA was the first signatory to the Excess Policy. There is no basis for finding that Israeli law applies.

incorporation here is sufficient to satisfy CREFAA."); *cf. Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) ("If a written arbitration provision is made enforceable against (or for the benefit of) a third party under state contract law, the statute's terms are fulfilled."). It is also effective under Pennsylvania, New York, and Illinois law.

Notwithstanding Illinois Union's efforts to distinguish the incorporated arbitration clause in *Century Indemnity*, that case controls here, at least in terms of its federal framework and to the extent Pennsylvania law governs. *Century Indemnity* involved a dispute between Century, a reinsurer, and Lloyd's, a retrocessionaire that had agreed to reinsure Century's reinsurance treaties with Argonaut. *See* 584 F.3d at 519. When Argonaut sought reimbursement from Century under Argonaut's reinsurance treaties with Century, Century paid out the expenses and turned to Lloyd's for indemnification. *Id.* at 519-20. Lloyd's refused, Century sued, and Lloyd's sought to compel arbitration under the theory that its retrocessional agreements with Century incorporated the underlying reinsurance treaties' arbitration clauses. *Id.* at 520. The retrocessional agreements contained two clauses with relevant language. Paragraph 1 incorporated the reinsurance treaties by reference ("made a part hereof"), while Paragraph 2 provided:

> Subject to the percentage allocation in the preceding paragraph, all terms and provisions of the [reinsurance treaty] shall be applied to this agreement as if contained herein, and [Lloyd's] shall receive prompt notice of any change in the Policy. Material changes are not binding on [Lloyd's] unless agreed.

*Id.* at 550 (alterations in original).

Following Pennsylvania law after conducting a choice of law analysis (the contract contained no explicit provision), *see id.* at 533, the court "assum[ed] that the sophisticated parties to the agreements chose their language, particularly that of the incorporating provisions, carefully." *Id.* at 551. It reasoned that Paragraph 1 served to identify the reinsurance treaty and

incorporate it by reference. More specifically, however, the court explained that Paragraph 2's language, stating that "all terms and provisions of the Policy shall be applied to this agreement as if contained herein," was strong phrasing that, under Pennsylvania law, means "precisely what [it] says." *Id.* at 552. Moreover, this language was stronger than that found in other clauses that sister circuits had found sufficient to incorporate arbitration clauses. *Id.* at 551-52 (citing *Progressive Casualty Insurance Co.*, 991 F.2d at 45-46). Century then attempted to argue that the language of the retrocessional agreements was effective to incorporate only the reinsurance treaties' "'substantive' issues relating to liability"—that is, liability coverage only—but not their "'administrative' issues such as the arbitration clause." *Id.* at 552; *see also id.* at 448 ("Century contends that the parties intended the retrocessional agreements' incorporation language only to clarify the scope of Lloyd's's 'substantive' obligations under the reinsurance treaties—that is, its liability—and not to incorporate other obligations that Century characterizes as 'procedural,' such as the agreement to arbitrate.").

The court rejected this argument that there was any distinction, let alone a determinative one, between substantive and administrative or procedural provisions:

> Paragraph 2's text does not easily admit such a reading; its incorporating language is inescapably broad. Thus, the more reasonable reading of Paragraph 2 is that the parties applied "all" of the reinsurance agreements' terms and provisions to the retrocessional agreement, except that Lloyd's's rights and obligations respecting premiums and losses are defined as stated in Paragraph 1 of the retrocessional agreements. The reinsurance treaties' arbitration provision does not conflict with Paragraph 1's allocation of liability and premiums, so the provision may be applied to the retrocessional agreements.

*Id.* at 552 (alterations in original). The court held that, despite the "imprecision inherent in general incorporation language . . . the most reasonable, probable, and natural construction of the incorporation-by-reference clause of the retrocessional agreements is to apply the clause to include the arbitration provision of the reinsurance treaties." *Id.* at 555.

Notwithstanding the Third Circuit Court of Appeals' burial of this substance-versus-procedure argument in *Century Indemnity*, Illinois Union attempts to revive it here. Sections I and IV(A) of the Excess Policy, Illinois Union asserts, "make clear that incorporation is limited to the existence of 'insurance coverage,' not to any procedural dispute resolution procedures." Illinois Union Resp. at 13. It argues that in *Century Indemnity* "the Third Circuit Court of Appeals emphasized that a provision must contain language that is sufficiently clear before an arbitration clause will be deemed incorporated by reference," *id.* at 14, and that "[t]he court's analysis, which declined to find that a clause that 'allocated risk' was sufficiently clear to incorporate a *procedural* clause, compels the conclusion in this case that the Illinois Union policy does not incorporate by reference the arbitration clause in the SRI policy," *id.* at 15. It urges that Section I and Section IV(A) of the Excess Policy "make[] plain that this incorporation wording only 'allocates risk'—by making the scope of insurance provided by the Excess Policy congruent with that of the 'Followed Policy.'" *Id.* On this ground, Illinois Union argues, the *Century Indemnity* Court distinguished *Exchange Mutual Insurance Co. v. Haskell Co.*, 742 F.2d 274, 275 (6th Cir. 1984). Illinois Union Resp. at 15-16 (citing *Century Indemnity*, 584 F.3d at 553 n.27). Because Section IV(A) of the Excess Policy states that "[i]n no event shall this policy grant broader coverage than would be provided by any of the Underlying Policies," and "coverage is further limited or restricted" by the language of "any other Underlying Policies," Excess Policy § IV(A), the language, Illinois Union contends, "makes it inescapably plain that terms are incorporated only for purposes of establishing congruency of the scope of insurance coverage." *Id.*

But Illinois Union fails to distinguish its argument from that which the Third Circuit Court of Appeals' rejected in *Century Indemnity*. As explained above, the *Century Indemnity*

Court found Paragraph 2's language, that "[s]ubject to the percentage allocation in the preceding paragraph, all terms and provisions of the [reinsurance treaty] shall be applied to this agreement as if contained herein," so "inescapably broad" that it incorporated the "administrative" or "procedural" condition of arbitration. *Century Indemnity*, 584 F.3d at 552. If not just as inescapably broad as that of Paragraph 2, the incorporating language of the Excess Policy at issue here is nearly so. Section I provides that "subject to all terms, definitions, conditions, exclusions and limitations of this policy [the Excess Policy], the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy [i.e., SRI Policy II]." Excess Policy § I. Section IV(A) then again states that the Excess Policy is "subject to . . . the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the policy period and except as otherwise provided herein) as are contained in or as may be added to the Followed Policy . . . ." *Id.* § IV(A). Illinois Union provides little reason, and certainly no persuasive one, for its contention that "all terms" (*Century Indemnity*) is broader, in a legally significant way, than "the" (Excess Policy § I) or "the same" (Excess Policy § IV(A)) "terms, definitions, conditions, exclusions and limitations" (Excess Policy §§ I & IV(A)).

Furthermore, there is little basis for Illinois Union's contention that this broad "incorporation wording only 'allocates risk.'" Illinois Union Resp. at 15; *see also* Illinois Union Surrep. at 4-5. In *Century Indemnity*, the Court faulted such verbal gymnastics and hair-splitting. Just as Paragraph 2 "applied 'all' of the reinsurance agreements' terms and provisions to the retrocessional agreement, except that Lloyd's's rights and obligations respecting premiums and losses are defined as stated in Paragraph 1 of the retrocessional agreements," *Century Indemnity*, 584 F.3d at 552, the Excess Policy provides that Illinois Union "agrees to provide insurance

23

coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy," Excess Policy § I, "except as regards the premium, the limits of liability, [and] the policy period," *id.* § IV(A). True, Illinois Union correctly reads "coverage" in Sections I and IV(A) to refer to the allocation of risk, Illinois Union Resp. at 15—or, as provided in Section IV(A) "the premium, limits of liability, [and] the policy period," Excess Policy § IV(A). But contrary to Illinois Union's contention that "incorporation is for the purpose of achieving a congruent scope of coverage, and not to borrow the procedural agreements between the underlying insurers and Teva," Illinois Union Resp. at 16, the plain reading of Sections I and IV(A) is that Illinois Union provided insurance coverage "in accordance with," or "subject to," the Followed Policy's "conditions," one of which is the mandatory arbitration provided for in Condition *o*. Condition *o* is a condition *of coverage*, not coverage itself; thus, Section IV's statement that "[i]n no event shall this policy grant broader coverage than would be provided by any of the Underlying Policies" is orthogonal to the question of whether Condition *o* is incorporated.[8]

Finally, Illinois Union's attempt to distinguish the Sixth Circuit Court of Appeals' decision in *Haskell* is puzzling. If *Haskell* is distinct from *Century Indemnity* to the extent that in *Haskell* the party to the second agreement, a subcontractor, "assume[d] the same obligations and responsibilities with respect to his performance under this Subcontract, that Contractor [in the underlying first contract] assume[d] towards Owner with respect to his performance on the General Contract," *Haskell*, 742 F.2d at 275, it is hard to see how such a distinction would militate in favor of Illinois Union, given that the court there found the arbitration provision

---

[8] And in any case, the "Underlying Policies" here must be only the "Followed Policy." There is no indication from the Complaint or the parties' representations at oral argument that the underlying primary insurance layer consisted of anything other than SRI Policy III. *See* Compl. ¶ 7.

incorporated and upheld the district court's compulsion of arbitration. *Id.* at 276. Indeed, in *Century Indemnity* and here as well, the relevant incorporating language is broader. In *Century Indemnity*, "the retrocessional agreements do not limit the parties against which the reinsurance treaties' arbitration clause are applied." *Id.* Nor does Section I, Section IV(A), or Condition *o*. By contrast, the Eighth Circuit Court of Appeals held language ineffective to incorporate an arbitration clause in *AgGrow Oils, L.L.C. v. National Union Fire Insurance Co. of Pittsburgh*, 242 F.3d 777, 781 (8th Cir. 2001), because of "limiting language" in the underlying reinsurance treaties that "specifically provided that [the underlying treaties] 'should not be construed to create a contractual relationship of any kind' other than that between the parties to that contract." *Century Indemnity*, 584 F.3d at 552-53 (quoting *AgGrow Oils*, 242 F.3d at 781).

At oral argument, and for the first time, Illinois Union raised one final argument, to wit, that Section V(C)'s specific treatment of notice precludes reading Sections I and IV(A) to incorporate all conditions of the SRI Policies. Section V(C) of the Excess Policy states in full:

> Notice: All notices under this policy shall be given as provided in the Followed Policy and shall be properly addressed to the appropriate party at the respective address as shown in the Declarations.

Excess Policy § V(C). (Item 7 of the Excess Policy's Declarations contains the address for notice under the Excess Policy.) Illinois Union contends that Section V(C) is an explicit incorporation clause that incorporates only the notice provision from the SRI Policies into the Excess Policy. Its logic seems to be that Sections I and IV(A) cannot be general incorporation clauses (at least not beyond "substantive" insurance "coverage"), because if they were general, then they would already have incorporated Item 7 and Section V(C) would be unnecessary and, therefore, superfluous. And, Illinois Union contends, *Century Indemnity*, like Pennsylvania contract law, disfavors superfluous terms that nullify others. *See Century Indemnity*, 584 F.3d at 551 ("Considering Paragraph 1 and 2 together, if Paragraph 2's incorporation provision only clarified

the extent of Lloyd's's derivative liability—something that Paragraph 1 just accomplished—then Paragraph 2 would be superfluous." (citation omitted)). Instead, taking its cue from Section V(C)'s *modus operandi*, Illinois Union contends, Sections I and IV(A) must incorporate only coverage provisions and Section V(C) must be the only procedural or administrative incorporation provision, and it says nothing about arbitration.

But this strained argument not only ignores the general thrust of *Century Indemnity*, it also disregards that court's acknowledgement that Paragraph 2 was a "*reiterative* incorporation clause" with regard to Paragraph 1. *See id.* (emphasis added). In other words, incorporation language *can* be repetitive or reiterative without being superfluous; indeed, that is precisely the case here with Sections I and IV(A), and even V(C). And under the reading of the Excess Policy that the Court adopts—that Sections I and IV(A) incorporate Condition *o*—Section V(C) is perhaps reiterative, but it is not superfluous. Instead, Section V(C) is clarifying with respect to the limited issue of its express concern, i.e., notice. Item 7 of the Declarations provides addresses for notice, but no actual statement (i.e., a sentence) regarding notice or how it should be made. Thus, if the Excess Policy had *lacked* a notice provision, then technically the Excess Policy would not have "otherwise provided herein" for notice to Illinois Union rather than SRI, even if common sense would dictate that notice be sent to Illinois Union rather than SRI. The space between "reiterative" and "superfluous" is surely not enough for Illinois Union to discard the central reasoning of the *Century Indemnity* Court that broadly worded incorporation clauses have precisely the effect they say they have.[9] Indeed, Illinois Union's reading of the Excess Policy

---

[9] Illinois Union's argument, *see* Illinois Union Supp. Br. at 4, that Pennsylvania law prevents terms of a contract from being "interpreted in a manner which nullifies other terms," *Brown v. Cooke*, 707 A.2d 231, 233 (Pa. Super. Ct. 1998) (citation omitted), does not militate against the result the Court reaches here. The language immediately preceding Illinois Union's selection from *Brown v. Cooke* states: "Clauses in a contract should not be read as independent agreements thrown together without any consideration of their combined effect. Indeed, the document is best

approaches nonsense because, taken to its logical conclusion, it would purport to render Section I

and/or IV(A) of the Policy superfluous, at least with regard to "administrative" or "procedural"

provisions, rather than Section V(C)—because, of course, Illinois Union wants to give effect to

Section V(C) rather than Sections I and IV(A).[10]

     For all these reasons, none of Sections I, IV(A), or V(C) can be said to be superfluous,

*Century Indemnity*, 584 F.3d at 551, or "duplicative," *GGIS Ins. Servs.*, 773 F. Supp. 2d at 503.

---

read as a whole, wherein clauses seemingly in conflict are construed, if possible, as consistent with one another." *Id.* (citation omitted). Construing Sections I and IV(A) to incorporate the SRI Policies into the Excess Policy, and Section V to incorporate, or at least clarify, the notice provisions, relies on "consideration of [the Sections'] combined effect" and results in a "consistent" and coherent reading.

    Illinois Union's citation to *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011), is no more persuasive. In *Colorcon*, the court confronted *ambiguous* contractual language, whereas the language at issue here, as in *Century Indemnity*, is not in fact ambiguous. Rather than dispute what the Excess Policy's language says or means, the parties dispute its *legal effect*. *See Century Indemnity*, 584 F.3d at 550-51 ("[N]either party claims that the provisions of the retrocessional agreements are ambiguous with respect to the first fundamental question on this appeal, whether the parties entered into a valid arbitration agreement establishing a mechanism for resolution of the dispute in this case. Thus, we will seek to give effect to the parties' agreements and thus their obligation *vel non* to arbitrate disputes solely by making reference to the documents themselves, taking the entire contracts into consideration and assuming that the sophisticated parties to the agreements chose their language, particularly that of the incorporating provisions, carefully."). In addition, the dispute in *Colorcon* centered on ambiguous language in a *noncompete* contract—a disfavored species. "[B]ecause non-competition agreements restrain an employee's ability to practice his or her chosen trade, they are strictly construed against the employer." *Colorcon*, 792 F. Supp. 2d at 797 (citation and internal quotation marks omitted).

[10] Teva understands Illinois Union's Section V(C) argument as the "surprising contention that the Illinois Union Policy incorporated only a single SRI Policy condition through Section V(C)" and notes that this assertion "is inconsistent with Illinois Union's complaint, which seeks declarations from this Court regarding conditions (b), (c), and (d) of the SRI Policy." Teva Supp. Br. at 4 (Docket No. 32). To the extent that Teva has characterized Illinois Union's argument accurately, it is correct, but the Court is inclined to understand Illinois Union's argument as more nuanced, even if ultimately unavailing for the reasons set out.

    Nonetheless, there is a final, practical reason for rejecting Illinois Union's Section V(C) argument: it depends much on an assumption that insurance contracts like the Excess Policy are painstakingly laid down line by line, rather than the accretive result of, as Teva contended at oral argument, the geological strata of recycled policy language.

Under *Century Indemnity* and Pennsylvania law, the Excess Policy incorporates Condition *o* of the SRI Policies and binds Illinois Union and Teva to arbitrate in London.

*   *   *

If New York or Illinois law applies, the result is no different.[11] As the Third Circuit Court of Appeals recognized in *Century Indemnity*, the Second Circuit Court of Appeals, in *Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42 (2d Cir. 1993), relied on even weaker language to find an arbitration clause incorporated by reference. *See Century Indemnity*, 584 F.3d at 551-52. In *Progressive*, the Second Circuit Court of Appeals applied New York law to construe a retrocession agreement to incorporate the underlying reinsurance agreement's arbitration clause based only on the retrocession agreement's "subject to" clause. *Century Indemnity*, 584 F.3d at 540-41. The retrocession agreement provided, in pertinent part, that the policy was "Subject to the Facultative Reinsurance Agreement," a document that in turn provided that "[a]ny question or dispute arising between the contracting parties concerning the interpretation of this Reinsurance Agreement . . . shall be settled by arbitration in London, England." *Progressive*, 991 F.2d at 45. The court, noting that the FAA "preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate," *id.* at 46 (citation omitted), and finding "that New York law governs here," explained that "in the absence of fraud or other wrongful conduct, a party who signs a written contract is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions," *id.* The court therefore held that

---

[11] The Court engages in this analysis to satisfy itself that its state law interpretation pursuant to the FAA and CREFAA is correct. As they acknowledged at oral argument, the parties do not dispute that if this Court decides the arbitrability question (as it does) then *Century Indemnity* and Pennsylvania law should apply, although, as acknowledged above, they did not want to be pinned down to a more definite statement in light of anticipated litigation.

the party resisting arbitration, "as a very sophisticated party, [was] deemed as a matter of law to have understood and agreed to all aspects of the Policy." *Id.* at 47. Through the mere words "Subject to," the policy incorporated by reference the underlying policy's arbitration clause because, the court reasoned, the arbitration clause was "not so restrictively worded that it does not bind the [resisting party] as a matter of law." *Id.* at 47-48. Once incorporated, the arbitration clause's provision "for arbitration of disputes between 'the contracting parties'" applied to the parties incorporating the clause in the agreement at issue. *Id.* at 48. Indeed, the Third Circuit Court of Appeals read *Progressive* just this way. *See Century Indemnity*, 584 F.3d at 550, 555 ("If the incorporated clause strictly preserved its original, literal meaning, 'the contracting parties' would include only the parties to the original contract, i.e., A and B. But courts nevertheless have held that such clauses, when incorporated into subsequent contracts through general language of incorporation, may apply to the parties to the incorporating contract, i.e., B and C." (citing *Progressive*, 991 F.2d at 44-46)).

The *Progressive Casualty Insurance Co.* Court's rules and reasoning applies with equal force here. Condition *o* is a broad arbitration clause that makes no mention of parties, but only of "any controversy arising out of or relating to this Policy or its breach." SRI Policy II, Condition *o*. And the language in the Excess Policy providing that coverage shall be provided "in accordance with the" (Excess Policy § I) or "subject to . . . the same" (Excess Policy § IV(A)) "terms, definitions, conditions, exclusions and limitations" (Excess Policy §§ I & IV(A)) is patently as broad as "Subject to," the language from *Progressive* that the Third Circuit Court of Appeals in *Century Indemnity* explained was phrased less "strongly and expansively" than the language in *Century*, but was nonetheless "held to incorporate the arbitration clause." *Id.* at 551.

Finally, Illinois Union does not suggest that the result would be any different under Illinois law. In light of the Seventh Circuit Court of Appeals' acceptance of such general incorporation-by-reference language in *Sphere Drake Insurance Ltd. v. All American Insurance Co.*, 256 F.3d 587, 588 (7th Cir. 2001), and for the same reasons articulated by the Second and Third Circuit Courts of Appeals, the Court also finds that the language of the Excess Policy would incorporate Condition *o* if Illinois law applied to the Excess Policy.

\*   \*   \*

For present purposes, Illinois Union and Teva are equally "sophisticated parties" and must be assumed to have "chose[n] their language, particularly that of the incorporating provisions, carefully." *Century Indemnity*, 584 F.3d at 551. Because their agreement need not be "express" and "unequivocal"—a standard that applies only if there is a "genuine issue of fact concerning the formation of the agreement," and Illinois Union and Teva do not raise one—the Court's task is to construe "the legal effect of the uncontested contractual language," *id.* at 530-32 (internal quotation marks omitted), under *Guidotti* and *Century Indemnity*, as a matter of law. For the foregoing reasons, the Court holds that the Excess Policy incorporates Condition *o* as a binding arbitration agreement between Illinois Union and Teva USA and Teva Israel.

### 3.     The Scope of the Arbitration Agreement in Condition *o*

Because the Court holds that the parties have agreed to arbitrate by incorporating Condition *o* into the Excess Policy, one question remains: Whether "the dispute at issue falls within the scope of [the arbitration] agreement." *Century Indemnity*, 584 F.3d at 523. Illinois Union does not argue that Condition *o* is too narrow in scope to cover its dispute with Teva; rather, Illinois Union only argues that Condition *o* is not applicable to the Excess Policy. Having

determined that Condition *o* does apply, however, the Court also determines that Condition *o* encompasses the claims in Illinois Union's Complaint.

Although Illinois Union correctly points out that neither the Third Circuit nor the Supreme Court has established a presumption in favor of finding an arbitration agreement where there is ambiguous language, *see Century Indemnity*, 584 F.3d at 527, where an arbitration agreement exists, "there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Century Indemnity*, 584 F.3d at 524 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650 (1986)). Moreover, Condition *o*'s broad language provides that "[*a*]*ny* controversy arising out of or relating to this Policy or its breach shall be settled by final and binding arbitration." SRI Policy II, Condition *o* (emphasis added). There can be no serious dispute—nor do the parties engage in one—that such broad language covers claims based on untimely notice of claims, estoppel, waiver, breaches of the Excess Policy's participation and cooperation clauses, breach of duties and warranties, failure to exhaust, and so on. *See* Compl. Indeed, counsel for Illinois Union conceded at oral argument that if Condition *o* is incorporated into the Excess Policy, then it will cover at least some of the claims in Illinois Union's Complaint.

In sum, under Pennsylvania, New York, or Illinois law, Condition *o* is incorporated into the Excess Policy and therefore binds Illinois Union to disputes within its scope. Because the claims in Illinois Union's Complaint fall within Condition *o*'s scope, Illinois Union and Teva must arbitrate their dispute in London pursuant to the terms of Condition *o*.

**B.	There Is No Basis for Deferring to a Prospective Ruling of the English Commercial Court**

Before entering an order compelling the parties to arbitrate pursuant to Condition *o*, the Court will address Illinois Union's alternative argument is that it should decline to rule on Teva's Motion to Compel Arbitration because "the identical issue is pending before the [English] Commercial Court." Illinois Union Resp. at 6. Illinois Union suggests that "[a]n English Court, in determining the question of incorporation under the arbitration clause, would apply English law" and find that no agreement to arbitrate exists because arbitration clauses are incorporated only by "*specific reference*." *Id.* at 6-7. Illinois Union also argues that the English Commercial Court will likely set aside any future arbitral award resulting from this Court's potential compulsion of arbitration and therefore that, upon the parties' return to this Court for confirmation of the award, this Court will be constrained not to confirm the award under 9 U.S.C. § 207.[12]

This Court intimates no view on the prospects of the parties' litigation before the English Commercial Court. Nor would this Court entertain the argument, which Illinois Union wisely chooses not to advance (as confirmed at oral argument), that English law should apply to *this* Court's determination of whether the parties agreed to arbitrate via incorporation by reference. That argument would be foreclosed by the Court's foregoing reasoning and holding, for it would ignore the applicable legal rules that follow from the FAA and CREFAA. And in any case, Teva

---

[12] Section 207 provides in full:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207.

is correct that such an argument would place too much reliance on Condition *o*'s language: all that provision establishes is that the United Kingdom Arbitration Act shall apply to the arbitration itself, not that English law is the choice of law of either the SRI Policies or the Excess Policy. *Cf. Gen. Elec. Co.*, 270 F.3d at 153 ("Although the arbitration clause called for the application of Swiss law, that provision applied to the arbitration proceeding, not to the initial determination of whether there had been an agreement on who would decide arbitrability.").[13]

Instead, Illinois Union appears to restrict its argument to the assumption that English law will govern the construction of the Excess Policy in the English Commercial Court, which will consequently find that there was no agreement to arbitrate. *See* Illinois Union Resp. at 6-13. Notwithstanding the possibility that the Commercial Court would reach a different conclusion, this Court is not persuaded that there is any appropriate reason to stay or defer its ruling.[14]

Indeed, nothing in the FAA and CREFAA indicates that an American court should do what Illinois Union urges, viz., wait for a foreign court to decide the issue of arbitrability, especially where, as here, the party seeking to avoid the American court's decision initiated suit in that very court. If this jurisdictional situation has consequences, Illinois Union cannot say that it was not the master of its Complaint. And Illinois Union's argument that "the court should stay the action before it" when "the parties will not be prejudiced," Illinois Union Rep. at 10, is perplexing: Illinois Union's premise is that the very outcome of the arbitrability issue will

---

[13] That illogic might proceed as follows: The reference to the United Kingdom Arbitration Act 1996 serves as a choice of law provision for Condition *o* and SRI Policies II and III, and it bootstraps its way up into the Excess Policy, by incorporation, to reach back down and provide that the Excess Policy's choice of law is England's, under which Condition *o* is not incorporated into the Excess Policy.

[14] The mere citation of a District of Massachusetts opinion suggesting that an American court might grant a stay "because of parallel litigation in a foreign forum," *id.* at 10 (citing *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248, 250 (D. Mass. 1999)), is unavailing, especially when the FAA's clear and unambiguous policy has been to favor arbitration.

depend on whether this Court or the Commercial Court reaches the issue first. If an adverse determination of the issue does not qualify as prejudice, then it is unclear what, if anything, does.[15]

Second, Illinois Union's contention that "[a]n arbitration panel could not proceed in this matter under English arbitral law if the Commercial Court finds the prospective panel lacks jurisdiction because there is no valid arbitration clause" misses the point. Illinois Union has offered no argument or case law to suggest that the English courts would interfere with an American judgment compelling arbitration by readjudicating arbitrability if this Court resolves the question first. Even if Teva would subsequently have to apply to the Commercial Court for the appointment of a second arbitrator under the English Arbitration Act 1996, nothing indicates that the Commercial Court would attempt to revisit this Court's judgment holding the dispute arbitrable in the first instance. Illinois Union argues that "deferring to the Commercial Court is consistent with international comity," but one need not peer into a crystal ball to see Teva making this same argument to the Commercial Court—but with regard to deference to *this* Court—in the near future. In other words, to the extent that deferring to a foreign court until the day it might reach a different result respects comity, so too does expecting that foreign tribunal to abide by the American court's resolution of the matter. At that point, it would seem, any refusal by Illinois Union to appoint arbitrators following this Court's compulsion of arbitration would be in violation of this Court's order (and at oral argument, Illinois Union assured it would not flout an order from this Court). Moreover, the Third Circuit Court of Appeals rejection of a similar argument pointing to the procedural irregularity that might result from the court's

---

[15] Illinois Union's contention that Teva "rush[ed] to file in this Court in response to Illinois Union's plan to file an action in the Commercial Court" is disingenuous, given that Illinois Union itself initiated suit in this Court. *See also* Teva Rep. at 5 ("Teva was required to respond to the Complaint within the time prescribed by the Federal Rules of Civil Procedure—and it is well-settled that a defendant may file a motion to compel arbitration in lieu of an answer.").

compulsion of arbitration in *Rhone Mediterranee Compagnia Francese di Assicurazioni e Riassicurazoni v. Lauro*, 712 F.2d 50, further suggests that these considerations need not detain this Court at this time. There, the party seeking to avoid arbitration "urge[d] that th[e] rule may result in a Neopolitan arbitration award which, because of Italy's odd number of arbitrators rule, the Italian courts would not enforce." *Id.* at 54. But the court, dismissing this concern, reasoned that "an award may still result, which can be enforced outside Italy." *Id.*

Finally, Illinois Union does not squarely tackle Teva's contention that the Supreme Court's arbitration case law "requires federal courts to send arbitrable disputes to arbitration quickly." Teva Rep. at 4. In *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, the Supreme Court noted "Congress's clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." 460 U.S. 1, 22 (1983). (Although counsel for Illinois Union attempted to distinguish *Moses Cone* at oral argument on the grounds that there was an agreement to arbitrate in *Moses Cone*—but not here— that argument is foreclosed by this Court's holding that the Excess Policy incorporates Condition *o*.) The Federal Arbitration Act "favors arbitration over litigation" where the court is satisfied that the parties have agreed to arbitrate, and "[t]his policy 'applies with special force in the field of international commerce.'" *Standard Bent Glass Corp.*, 333 F.3d at 450 (quoting *Mitsubishi Motors*, 473 U.S. at 631). CREFA, incorporated into Chapter 2 of the FAA, "*commits* the courts of signatory states to refer parties to arbitration when the parties have agreed to arbitrate disputes." *Sandvik*, 220 F.3d at 104-05 (emphasis added). "Neither the parochial interests of the forum state, nor those of states having more significant relationships with the dispute, should be permitted to supersede that presumption [of the enforceability of agreements to arbitrate]. The policy of the Convention is best served by an approach which leads to upholding agreements to

arbitrate." *Rhone Mediterranee*, 712 F.2d at 54. Consequently, if CREFAA is satisfied, "the court must order arbitration unless it determines the agreement is null and void." *Standard Bent Glass Corp.*, 333 F.3d at 449.

In brief, a decision by this Court to decline to rule on the arbitrability of this dispute would not bolster comity so much as it would shirk the FAA and CREFAA's mandate and condone forum shopping. It would also risk pandering to what Illinois Union represents is English policy at the expense of effectuating the parties' intentional, bargained-for agreement. What the English Commercial Court may or may not do regarding this Court's judgment compelling arbitration is a question for another day.

### C. The Court Declines to Award Attorneys' Fees and Costs

The Court declines to award Teva attorneys' fees and costs associated with filing this motion and with defending Illinois Union's action before the English Commercial Court. "In suits to compel one party to submit to arbitration or abide by an award, fees are generally awarded if the defaulting party acted without justification or if the party resisting arbitration did not have a reasonable chance to prevail." *Chauffeurs, Local Union No. 765 v. Stroehmann Bros.*, 625 F.2d 1092, 1094 (3d Cir. 1980) (citations and internal quotation marks omitted). This decision of whether to award attorneys' fees and costs is committed to the discretion of the court, *see Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 43 n.2 (3d Cir. 1985), and a finding that a party had no reasonable chance to prevail is often tantamount to determining that "the losing party litigated in bad faith, vexatiously, or for oppressive reasons," *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 305 (3d Cir. 1982).

Although Illinois Union is ultimately wrong in its contention that it did not agree to arbitrate this dispute, the Court does not find that Illinois Union's defense of the Motion to Compel Arbitration amounted to bad faith litigation or litigation without a reasonable chance to

prevail. Though Illinois Union cites no case law in its response to Teva's request for Attorneys' fees, *see* Illinois Union Resp. at 17, it is correct in suggesting that the parties have zealously, and respectfully, fought over which law governs the construction of the contract (and therefore incorporation), as well as which law governs the arbitration clause itself, and whether this Court or the Commercial Court should decide the issue of arbitrability presented in the Motion. Although Teva's argument prevails under controlling law, the Court declines to say that Illinois Union had no reasonable basis to prevail.

**CONCLUSION**

For the reasons stated, the Court holds that the Excess Policy binds Teva USA and Teva Israel, on the one hand, and Illinois Union, on the other, to arbitrate in London pursuant to Condition *o* in SRI Policy II. The Court declines to award Teva attorneys' fees and costs. Accordingly, Teva's Motion to Compel Arbitration and for Attorneys' Fees and Costs (Docket No. 6) is granted in part and denied in part.

\* \* \*

An Order consistent with this Memorandum follows.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge